RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LORI SHREVE,

       *Plaintiff-Appellant,*

     *v.*

JESSAMINE COUNTY FISCAL COURT; DAVID MUDD
and SEAN FRANKLIN, in Their Individual and
Official Capacities as Jessamine County Deputy
Sheriffs,

       *Defendants-Appellees.*

No. 05-6271

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 04-00292—Karl S. Forester, District Judge.

Argued: May 12, 2006

Decided and Filed: July 7, 2006

Before: SILER and ROGERS, Circuit Judges; JORDAN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Edward E. Dove, DOVE LAW OFFICE, Lexington, Kentucky, for Appellant. Stephen G. Amato, McBRAYER, McGINNIS, LESLIE & KIRKLAND, Lexington, Kentucky, for Appellees. **ON BRIEF:** Edward E. Dove, DOVE LAW OFFICE, Lexington, Kentucky, for Appellant. Stephen G. Amato, Jaron P. Blandford, McBRAYER, McGINNIS, LESLIE & KIRKLAND, Lexington, Kentucky, for Appellees.

---

## OPINION

---

    ROGERS, Circuit Judge. This appeal seeks reversal of the district court's grant of summary judgment in favor of the defendant sheriff's deputies, who allegedly used excessive force in violation of 42 U.S.C. §§ 1983, 1985, and state law when they arrested plaintiff Lori Shreve. Shreve further alleges that the deputies unlawfully entered and searched her home to arrest her in violation

---

    [*]The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

of the Fourth and Fourteenth Amendments.  The defendants include the Jessamine County Fiscal Court, and the deputies in their official capacity.

The district court granted summary judgment in favor of all the defendants, holding that no constitutional violation occurred.  The district court also held that the deputies lawfully searched Shreve's home to find and arrest her pursuant to a valid misdemeanor arrest warrant.

Summary judgment was not warranted on Shreve's excessive force claim because she has provided sufficient, if spare, evidence of a violation of her clearly established right to be free from excessive police force in the course of arrest.  Summary judgment was however warranted with respect to Shreve's claims for unlawful entry and search of her home to arrest her.  Like our sister circuits we read *Payton v. New York*, 445 U.S. 573 (1980), to permit forcible entry into the home to search for and arrest a suspect pursuant to a valid arrest warrant, regardless of whether the arrest is for a misdemeanor or a felony.  We therefore affirm in part and reverse in part.

## I.

Around August 21, 2003, the Fayette District Court issued an arrest warrant for Lori Shreve for second degree bail-jumping, a misdemeanor.  Ky. Rev. Stat. § 520.080(3).  Around midnight on September 12, 2003, David Mudd, a deputy sheriff for Jessamine County, drove to Shreve's house to arrest her.  Deputy Sean Franklin joined Deputy Mudd at the Shreve residence.  These two tried to make contact with Shreve at her house at about 12:50 a.m.

The police rang the doorbell, knocked on the door, and shined bright lights into the house.  Shreve and her boyfriend, George Bitting, were inside the residence together.  Neither of them answered the door.  According to Deputy Mudd, he saw Shreve peer out of an upstairs window.  He recognized Shreve from a picture of her that he had obtained from the Fayette County Detention Center website.

Shreve knew that the people knocking at the door were deputies.  She did not open the front door because, in her words, "I didn't want to go to jail."  Shreve and Bitting heard the phone ring but did not answer it.  They also heard the police attempt to pick the locks.  As Deputy Mudd successfully picked the deadbolt lock on one of the doors, the knob lock on the door's handle "suddenly became locked," suggesting to Deputy Mudd that someone inside the house had locked the door just as he finished picking it.  Shreve and Bitting gave no response to the deputies' attempts at making contact.  "We were just waiting to see if they were going to break in," Shreve recalled at her deposition.  She hoped that the police would go away.

After receiving no response for about an hour, the police forcibly entered Shreve's house around 2:00 a.m.  Upon entering the home, the deputies restrained Bitting and began searching for Shreve.  At some point, Shreve hid in the bedroom closet and put a blanket over her head.  Shreve remained there for an unknown period of time until the deputies came up the steps to her room in search of her.  Shreve heard the deputies call out to her, "Ms. Shreve, you need to come out."  She gave no response.  Shreve was trying to remain undiscovered, and in her deposition she described her behavior as "hiding."  The deputies threatened to pepper spray Shreve, which alerted her to their presence in her bedroom.  Shreve still gave no response.

It is undisputed that the police then sprayed pepper spray into the closet.  Shreve says the pepper spray caused her to feel "out of it."  The police then, according to Shreve, ripped the blanket off of her head, grabbed her by the hair and wrist, and threw her outside of the closet onto the ground.  One of the deputies then began, in Shreve's words, "jumping on my back with his knee . . . and then I was incoherent."  Shreve says that she later "came to" and "kept feeling this hitting on my face and my back and I said, quit hitting me."

But when the police's attorney asked follow-up questions during her deposition, Shreve contradicted her claim of having spoken to the deputies, saying, "I couldn't say anything," and, "I couldn't speak" because of the pepper spray's effects. Later in her deposition, however, Shreve reasserted that she had said, "quit hitting my face." Likewise, Shreve changed her account of having her hair pulled: she did not actually recollect having her hair pulled; rather, she inferred that her hair was pulled because "handfuls of hair" fell out after she reached the jail.

In any event, Shreve stated that she landed on her belly when the police "dragged" (or, in her earlier and later tellings, "threw") her to the ground out of the closet. Shreve said that she could not use any word other than "crouch" to describe her body positioning on the ground, but then later said she was "laying [sic] . . . sprawled out." A deputy then "jump[ed]" on Shreve's back with his knee. Shreve said she could not see the deputy but then stated that he was on one side of her or behind her.

Deputy Mudd in his deposition said that he placed his knee "on top of" Shreve until she was handcuffed. The deputies pulled Shreve's wrists behind her back and handcuffed her through the use of pressure point submission techniques. In Shreve's telling, one of the deputies then beat her back and her face with a "billy club." Shreve said that she did not actually see anyone hit her with a stick. But she also maintains that one, not both, of the deputies struck her. Shreve also said in her deposition that she saw the deputy holding a stick at one point. She maintains that the deputy struck her with a stick ten to twelve times "in the eye" and an unknown number of times in the back. Shreve claims that the deputy "jumped" on her back with a knee and beat her with a stick more or less constantly for fifteen or twenty minutes. Shreve says that her "whole face was black and blue when [the deputy] got done" beating her. In her answers to interrogatories as well, Shreve claimed that she suffered "[b]lack eyes and face from being hit by Franklin; Back injury and bruises on wrist and back from M[u]dd jumping on Plaintiff's back with knee . . . ." Deputy Mudd said that neither he nor Deputy Franklin struck Shreve, and that Shreve had no bruises on her face at the time of the arrest.

Shreve says that she "did not resist at all" when the deputies first attempted to handcuff her. Shreve explained that "resist," as she uses the word, means biting or scratching, or otherwise putting up a fight. Consistent with Shreve's account, Deputy Mudd in his deposition nowhere stated that Shreve bit, scratched, or otherwise put up a fight. Instead, according to Deputy Mudd, Shreve resisted *passively* when she refused to "release her arms" voluntarily for handcuffing even after the deputies had applied force to several pressure points and thereby caused Shreve to moan in pain. Deputy Franklin succeeded in catching hold of Shreve's hands by bringing the "flat" of his own hand across the bridge of Shreve's nose, in an effort to make her eyes water. Shreve reacted by throwing up her hands to try and protect her eyes, which reaction enabled Deputy Mudd to handcuff her.

After handcuffing her, the deputies marched Shreve down the stairs and into a police car. They charged Shreve with resisting arrest. Shreve was taken to the Jessamine County Detention Center and booked. She was later moved to the Lexington Detention Center.

According to Shreve's deposition, she seeks ongoing chiropractic "manipulations" from Bitting for her neck, back, and shoulder injuries. She does not receive treatment for any facial injuries. In fact, Shreve never sought any medical treatment for her alleged facial injuries. Although Shreve asked to see a doctor while in the Jessamine County jail, no doctor was available to see her. She was later transferred to the Lexington Detention Center, but she did not request medical treatment there.

The record contains two pictures of Shreve that show the extent of her facial injuries several days after her arrest. The pictures were taken, according to Shreve, "[a]bout the fourth or fifth day

I was there [in jail.]" One of the photographs shows a close-up image of Shreve's right eye. The picture shows some discoloration below the right eye suggestive of a black eye. Likewise, a second picture in the record shows the same discoloration, but from a far enough distance that the picture captures Shreve from the shoulders up. Neither of these photos shows any significant swelling, cuts, or other visible sign of severe injury or past bleeding (that a lay observer would recognize as such). The pictures show some discoloration of the right eye.

Shreve originally brought this suit in state court, but the suit was removed to the federal district court below. The district court granted the defendants' motion for summary judgment on all federal claims. The district court said that Deputy Mudd, after removing Shreve from the closet,

> restrained Shreve by placing his knee above and across her back while attempting to handcuff her. Shreve refused to offer her hands for cuffing and kept them tightly tucked up under her torso. Deputy Mudd attempted several different pressure point distractions in order to get Shreve to release her hands, but she refused. Deputy Franklin then utilized a pressure point/pain distracting effort in order to cause Shreve to involuntarily produce her hands. The deputies handcuffed Shreve, stood her up and escorted her from the home.

After relating in essence the deputies' account, the district court next described what it termed Shreve's "claim[s]" about what happened. "Shreve claims that during the arrest she was struck multiple [times] in the face and back with a nightstick." The district court pointed to weaknesses in Shreve's story: "She states that she did not actually see either Deputy Mudd or Deputy Franklin strike her with the nightstick, but saw one of the deputies with a stick in his hand." The district court did not address Shreve's claim that one of the deputies jumped on her back with his knee. The district court noted that Shreve claimed to have suffered injuries but also observed that Shreve had produced no medical documentation of her injuries and that the "only evidence of her injuries is a color photograph taken at the jail shortly after her arrest."

The district court held that no rational juror could find that the police had used excessive force in violation of Shreve's rights. The deputies reasonably used pepper spray under the circumstances, the district court determined, because their warning to Shreve to leave the closet went unheeded and because they sprayed the pepper spray "generally" into the closet rather than directly at Shreve.

The district court reasoned that the deputies reasonably placed a knee across Shreve's back because Shreve "continued to resist arrest" by refusing "to provide her hands" for cuffing. In doing so, the district court did not mention Sheve's allegation that a deputy had jumped on her back repeatedly with his knee.

Finally, the district court held that there was not sufficient evidentiary support for Shreve's allegation that the deputies violated her rights by striking her with a nightstick. "Shreve presented nothing more than a bald assertion that either Deputy Mudd or Deputy Franklin struck her with a nightstick; she has failed to present any evidence substantiating her claim." The district court emphasized that Shreve did not actually see either of the deputies swing the stick.

The district court also noted that the photograph of Shreve showed "some bruising and redness," but these injuries "appear relatively mild." These injuries "could have been completely consistent with a reasonable use of force." Because the photographs "could have been" consistent with the police account, the district court held, they "are not sufficiently probative and created no trial[-]worthy issue of fact on the question of whether Deputies Mudd and Franklin used excessive force."

The district court also held that because the deputies acted on the authority of a valid arrest warrant, they did not violate the Fourth Amendment by entering Shreve's home by force and searching for her there.

The district court declined to exercise supplemental jurisdiction over the remaining state law claims and remanded them back to state court. Finally, the district court dismissed the claims against the Jessamine County Fiscal Court and the deputies in their official capacity because there was no basis for such claims once the court had determined that the deputies had not violated Shreve's constitutional rights.

## II.

While the evidence may appear to predominate against Shreve's version of events, she has nonetheless proffered sufficient evidence to survive summary judgment. We therefore reverse the grant of summary judgment regarding the excessive force claim. Shreve has provided sufficient evidence of a violation of her clearly established constitutional right against the use of excessive police force in the course of arrest, and qualified immunity is not warranted under *Saucier v. Katz*, 533 U.S. 194, 200 (2001). *Saucier* held that a plaintiff's case against a defendant's qualified immunity proceeds in two steps: "the first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level."

With respect to the first *Saucier* requirement, Shreve's account of her arrest describes an excessive use of force in violation of her Fourth and Fourteenth Amendment rights. Policemen may not strike an arrestee lying on the ground with a stick for about fifteen minutes, nor may they "jump" up and down on her back repeatedly with a knee—not even if she refuses to produce her hands for cuffing.

In her deposition Shreve alleges facts that amount to an excessive use of force. Shreve says that a deputy threw her onto the ground. While she was on the ground refusing to produce her hands for cuffing, a deputy struck her with a stick and repeatedly jumped on her back with a knee; this sort of conduct continued for about fifteen minutes.

At the time, Shreve had already been incapacitated by pepper spray. Such a use of force cannot be deemed reasonable under the excessive force test set forth in *Graham v. Connor*, 490 U.S. 386 (1989). *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (interpreting *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994), to hold that the use of force after a suspect has been "incapacitated by mace would be excessive as a matter of law").

Under *Graham*, this court determines the reasonableness of the deputies' use of force by performing a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotation marks omitted). The court weighs Shreve's interest in not being struck and jumped on against the deputies' interest in performing these actions, as gauged by the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

Under this standard, Shreve of course had a significant interest in not being hit with a stick and jumped on for about fifteen minutes. Under *Graham*, Shreve's significant interest must be weighed against the deputies' interest. *See id*. The deputies had a significant interest in arresting Shreve expeditiously. The "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id*. The deputies' interest in an expeditious arrest, however, included no officer safety component. Shreve's alleged crime—second degree bail-jumping—carries no connotation of violence, *see* Ky. Rev. Stat. § 520.080(1), and

Shreve did nothing after she had been placed on the floor that would cause a reasonable officer to fear for anyone's safety. The deputies' interest, at most, justified only the amount of force that a reasonable officer in the heat of the moment could have believed was needed to end Shreve's passive resistance. The deputies' interest consequently justified their alleged use of pressure point submissions and the placing of a knee across Shreve's back to prevent her from wriggling free. These measures, from the perspective of an on-the-scene policeman, reasonably sought to motivate Shreve to produce her hands for cuffing.

But even to a reasonable policeman in the heat of the moment, the deputies' interest in an arrest could not have justified striking Shreve in the eye with a stick ten to twelve times while she was on the ground and "out of it" due to the pepper spray. *See Phelps*, 268 F.3d at 301 ("there was simply no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was"). Nor could the interest in an arrest have justified jumping up and down on her back with a knee, or striking her about the neck and shoulders with the stick, for around fifteen minutes. These alleged actions go so far beyond forcing Shreve to produce her hands that no reasonable policeman could see them as nonexcessive, not even in the heat of the situation.

It is true that the evidence of the deputies at this stage appears significantly stronger than that of Shreve. All except Shreve testified consistently to a version of events in which no excessive force occurred. Shreve, however, swore to a version of the facts that does amount to excessive force. To be sure, there are inconsistencies in Shreve's statements: she did not see the deputies holding nightsticks while hitting her, and there is not much physical evidence in support of her version of events. She did however testify that she *felt* the stick hitting her and that she saw a deputy holding a stick at some point. It is therefore ultimately up to the jury to believe her or not.

This is not a case where the defendants' evidence is so objectively compelling that no reasonable juror could believe Shreve. In determining whether to grant summary judgment, a court may not make determinations of witness credibility. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Adams*, 31 F.3d at 382.

Moreover, because Sixth Circuit case law supports Shreve's right not to be struck and jumped on gratuitously, qualified immunity is not available for lack of a "clearly established" right. *See Saucier*, 533 U.S. at 200. The district court did not reason that such gratuitous force was arguably unconstitutional, or that it was not "clearly established," but rather only that there was insufficient evidence that it occurred. Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest. In *Phelps*, 268 F.3d at 302, we held that *Adams*, 31 F.3d at 389, clearly established in 1991 the unconstitutionality of the use of gratuitous force against helpless and incapacitated suspects during arrest.

Because there was sufficient evidence to survive summary judgment on the excessive force claim, it is also necessary to reverse and remand Shreve's unreasonable force claims against the Jessamine County Fiscal Court and the deputies in their official capacity. The district court premised dismissal of the claims against these defendants on its conclusion that the deputies had violated none of Shreve's rights. Other bases for dismissing these defendants are not before us.

Although a genuinely disputed material issue of fact regarding a clearly established right precludes summary judgment with respect to the deputies' alleged striking of Shreve, the deputies did not use excessive force when they used pepper spray on her. Applying *Graham*'s balancing test, *see* 490 U.S. at 396, no rational juror could disagree that policemen on the scene could have reasonably suspected danger when Shreve remained in her closet concealed under a blanket in defiance of requests that she come out. A policeman on the scene could have reasonably concluded

that Shreve refused to reveal herself because she was lying in wait, perhaps seeking to ambush the deputies if they drew nearer to the closet to investigate. Consequently, the deputies violated no rights of Shreve's when they fired pepper spray into the bedroom closet.

## III.

Finally, the deputies acted lawfully when they broke into Shreve's house and searched it to arrest her, notwithstanding the fact that the arrest was for a misdemeanor. *See Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998) (assuming that police had authority to enter a home based on a misdemeanor warrant).

The Supreme Court held in *Payton v. New York*, 445 U.S. 573 (1980), that a warrantless entry into a home is generally not constitutional, but that a valid arrest warrant permits forcible entry into a suspect's home to search for and arrest the suspect. The Court's reasoning appears to apply regardless of whether the crime charged in the warrant is a misdemeanor or a felony. Restating the rule of *Payton*, the Eighth Circuit has said:

> A valid arrest warrant carries with it the authority to enter the residence of the person named in the warrant in order to execute the warrant so long as the police have a reasonable belief that the suspect resides at the place to be entered and that he is currently present in the dwelling.

*United States v. Clayton*, 210 F.3d 841, 843 (8th Cir. 2000). *Payton* itself says that arrest warrants charging *felonies* may authorize entry into the home, while saying nothing in particular about misdemeanor arrest warrants. 445 U.S. at 602-03. A footnote in the later case of *Steagald v. United States*, 451 U.S. 204, 214 n.7 (1981), explained the basis for *Payton*'s recognition of the authority to enter on the basis of an arrest warrant: "Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." This logic applies regardless of whether the warrant is based on a felony or a misdemeanor. Either way the warrant authorizes the police to deprive the person of his liberty.

This conclusion is supported by decisions of the Second and Eighth circuits. *See Clayton*, 210 F.3d at 843; *United States v. Spencer*, 684 F.2d 220, 222-24 (2d Cir. 1982). As the Second Circuit reasoned, cases such as *Payton* and *Steagald*, "in striving to safeguard a suspect's Fourth Amendment rights when he is arrested at home, emphasized the necessity that a warrant be issued by a neutral magistrate. The concern has been to prevent the unreasonable seizure of a person or property. In determining reasonableness, the nature of the underlying offense is of no moment." *Spencer*, 684 F.2d at 223-24.

Because the rule of *Payton* applies to the misdemeanor arrest warrant in this case, the deputies had authority to enter and search Shreve's house to arrest her. *See Clayton*, 210 F.3d at 843. The deputies had ample reason to believe that Shreve was inside because it was just after midnight, when most people are at home. Moreover, automobiles were at the house, signaling that people were home, and Deputy Mudd saw someone he thought resembled Shreve peering out at him from a window. Therefore, the deputies reasonably believed that Shreve was at home and available for arrest. The evidence of Shreve's presence that night satisfies *Payton*. The district court properly granted summary judgment in favor of the defendants on Shreve's claim for unlawful entry into and search of her home.

## IV.

For the foregoing reasons, we affirm the judgment in part, reverse it in part, and remand for further proceedings consistent with this opinion.