*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES WARREN SCHREIBER,

                            *Plaintiff-Appellant,*

        *v.*

OFFICER WILLIAM MOE and CITY OF GRAND RAPIDS,

                            *Defendants-Appellees.*

No. 09-1337

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 05-00091—Robert Holmes Bell, District Judge.

Argued: January 19, 2010

Decided and Filed: March 4, 2010

Before: SILER, MOORE, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Anthony C. Greene, LAW OFFICES, Grand Rapids, Michigan, for Appellant. Margaret P. Bloemers, CITY ATTORNEY'S OFFICE FOR THE CITY OF GRAND RAPIDS, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Anthony C. Greene, LAW OFFICES, Grand Rapids, Michigan, for Appellant. Margaret P. Bloemers, Nadine R. Klein, Patrick J. Lannen, CITY ATTORNEY'S OFFICE FOR THE CITY OF GRAND RAPIDS, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. In this 42 U.S.C. § 1983 action, Plaintiff-Appellant James Warren Schreiber ("Schreiber") appeals the district court's decision to grant, in part, the defendants' motion for summary judgment. In particular, Schreiber argues that the district court erred in concluding that, as a matter of law,

1

Defendant-Appellee William Moe ("Moe") was not liable for his warrantless entry into Schreiber's home or the force he used in subsequently arresting Schreiber. For the reasons discussed below, we **AFFIRM** the district court's judgment with respect to Schreiber's warrantless-entry claim, but **REVERSE** the district court's judgment with respect to Schreiber's excessive-force claim.

## I. BACKGROUND

On November 1, 2002, Moe, a police officer, was on patrol on the north side of the City of Grand Rapids. At approximately 3:45 p.m., he received a dispatch directing him to go to Schreiber's apartment. The dispatch was a "Priority 2," which encompasses cases where there is a risk of physical harm to a person at the scene. According to the computer display in Moe's car, someone had called 911 who claimed to have been talking to Schreiber's teenage daughter, Sarah, on the telephone and had heard her parents yelling. According to the caller, the telephone call had suddenly been disconnected, and, when the caller called Sarah back, Schreiber hung up the phone. The caller believed that Sarah was "getting beat." Doc. 51-4 (Ex. D at 1). The caller also asked to remain anonymous.[1]

Moe claims that, upon arriving at Schreiber's apartment, he could hear an angry male voice yelling profanities, and Schreiber admits that he was in a "heated" discussion with Sarah. Doc. 51-15 (Schreiber Dep. at 17). Moe proceeded to knock on the door, which was answered by a young boy around the age of ten. At this point, Moe could see Schreiber yelling at someone within the home. The parties seem to dispute, however, whether Sarah was visible to Moe at this point; Schreiber claims that she was, and Moe claims that she was not. Moe asked the young boy if Sarah was okay. Shortly thereafter, Schreiber came to the door, and according to Moe, Schreiber was shouting phrases such as "'what the fuck do you want'" and "'I hate the fucking police.'" Doc. 51-22 (Moe Prelim. Exam. at 11). According to Moe, Moe responded by explaining that he was there to check on Sarah's welfare, only to have Schreiber reply "'no, you fuckin'

---

[1]Both the district court and the parties cite the actual transcript of the 911 call, which provides some additional details. However, we have not found any evidence that Moe heard the 911 call or viewed a transcript of it, and so we have relied only on what information was available to Moe on his computer screen.

don't.'" *Id.* at 12-13. Schreiber does not deny making these statements, but does claim that he asked for a warrant and also that he explicitly told Moe that Sarah was fine. Moe then entered the home before Schreiber could close the door. Once through the door, Moe claims that Schreiber's wife invited him to come in further. Neither of the parties dispute that Moe did not have a warrant.

Upon entering the living room, Moe saw Sarah for what he claims was the first time. Both parties seem to agree that she was crying and visibly upset, though there were no obvious signs of physical injury. During this time, however, the house appears to have been in "chaos." Doc. 51-23 (Moe Prelim. Exam. at 17). Schreiber and Sarah continued yelling at one another, and Schreiber continued shouting various insults at Moe. In particular, Schreiber claims that he told Moe that Moe did not have a search warrant and admits that he "probably" called Moe a "Neo Nazi" and a "pig." Doc. 51-15 (Schreiber Dep. at 31). Furthermore, according to Moe, Schreiber also threatened to have Moe killed by the "Michigan Militia," a claim Schreiber does not deny. Doc. 51-23 (Moe Prelim. Exam. at 22). Moe decided to call for backup.

At some point during the altercation, Schreiber's wife, Emily, handed Moe a telephone and explained that a woman from Catholic Social Services was on the line. According to Moe, the woman, Cyndi Musto ("Musto"), proposed that Sarah leave the home and spend the night at a local youth shelter in order to get away from her father. In her deposition, Musto claims that she told Moe that she was concerned about Sarah's safety, but Musto later admitted that she could not "remember, actually, what was said." Doc. 51-19 (Musto Dep. at 31).

A short while later, Officer Veldman arrived on the scene in response to Moe's request for backup. After Veldman arrived, Moe proceeded to do a file check on Schreiber, during which Schreiber became agitated and asked if he could go to his room. Moe told Schreiber he could not leave because he might have weapons elsewhere in the home. According to Moe, Schreiber again started shouting at him, saying that Schreiber hated the police and that he wanted them all dead, a claim that Schreiber has not denied.

Schreiber then asked if he could go to the bathroom, and Moe again told him no.[2] Nonetheless, Schreiber attempted to walk past Moe, who responded by putting his hand up to block Schreiber's path. This prompted Schreiber to turn around and hurry onto an adjoining balcony that was about ten feet off the ground, throwing his couch to the side in the process. While on the balcony, Schreiber behaved erratically and attempted to find a way down.

The record is not entirely clear as to what happened next. Schreiber claimed in his deposition that he closed the sliding glass balcony door, though in an earlier interview with the Internal Affairs Unit, he claimed that Moe shut the door. Moe claimed that he closed the door so that he could speak with Sarah without any disruptions. The parties agree that Schreiber was subsequently unable to get back in the house, though they disagree as to why. Schreiber claims that Moe locked the door, though Schreiber admits that he never saw Moe do so.[3] Moe, however, claims that he never touched the lock. Schreiber also claims that Moe laughed when he saw that Schreiber could not re-enter, which caused Schreiber to get angry.

Schreiber claims that he "probably" demanded that Moe "open the F'n door," Doc. 51-15 (Schreiber Dep. at 36), and when Moe did not, Schreiber admits that he picked up a chair on the porch and used it to shatter the balcony door by hitting it several times. Schreiber then entered the apartment through the hole that he had broken in the glass, and from this point forward the parties' accounts of what happened differ sharply. Schreiber claims that he never made "any moves towards" Moe, never "lift[ed his] hands toward" Moe, Doc. 51-16 (Schreiber Dep. at 88), never tried to strike Moe, and was generally in control of his own behavior.[4] *Id.* at 89. Schreiber claims that he just walked

---

[2]According to Schreiber, he suffers from Irritable Bowel Syndrome, a condition that made his need to go to the bathroom especially urgent. However, there is no evidence that Moe was aware of this. Schreiber claims that his kids told Moe that "[w]hen dad has to go, he has to go," Doc. 51-15 (Schreiber Dep. at 33), but this alone gave no indication of an underlying medical condition.

[3]During his prior interview with the Internal Affairs Unit, Schreiber suggested that the door was broken and that this may have been why it did not open.

[4]Nonetheless, in an earlier part of his deposition, Schreiber contradicted this assertion by admitting that he was "probably out of control." Doc. 51-15 (Schreiber Dep. at 42).

back inside the apartment and then Moe " threw [him] down," *id.* at 43, rubbed his face in the glass, turned him around so he was face up, punched him in the face at least twenty times, and also squeezed his groin. *Id.* at 45-46, 60. Schreiber does admit, however, to calling Moe names throughout the incident. Moe, by contrast, claims that Schreiber charged at him when Schreiber came through the glass and that Moe "end[ed] up taking [Schreiber] to the ground." Doc. 51-23 (Moe Prelim. Exam. at 26). Moe further claims that Schreiber struck him about seven or eight times and that Moe struck back at Schreiber about six times and only in self-defense. Meanwhile, Officer Veldman was busy trying to prevent the other family members from entering the fray.

Once Schreiber was in custody, he was placed in a patrol car where he claims he suffered additional abuse that is outside the scope of this appeal. While in the car, Schreiber claims that Moe tried to "create a new version" of the events that occurred by telling him that it was Schreiber who struck first. Doc. 51-16 (Schreiber Dep. at 91). The hospital report indicates that, shortly after the incident, Schreiber's left eye was swollen shut, that he had "three major lacerations" on his face, and that he had facial bone fractures. Doc. 51-9 (Ex. I at 1-2). Schreiber also claims that, as a result of Moe's actions, he suffered headaches for three months and continues to have anxiety problems.

On December 16, 2003, Schreiber pleaded no contest in Michigan state court to attempting to "assault, batter, wound, resist, obstruct, oppose, or endanger" a police officer under Michigan Compiled Laws § 750.81d(1) and § 750.92. Doc. 51-1 (Ex. A at 1-3). On February 4, 2005, Schreiber brought this § 1983 action against Moe and Grand Rapids in the United States District Court for the Western District of Michigan. In the complaint, Schreiber alleged that Moe was liable for false arrest, illegal imprisonment, entering his home without a warrant, unlawful seizure, and the use of excessive force. Schreiber further claimed that Grand Rapids was vicariously liable due to its failure to train its officers adequately and its policy of tolerating officer misconduct.

The defendants moved for summary judgment, and the district court granted this motion in part. In particular, the district court found that exigent circumstances justified

Moe's warrantless entry into Schreiber's home and, in any event, that Moe was entitled to qualified immunity.  Furthermore, the district court determined that *Heck v. Humphrey*, 512 U.S. 477 (1994), barred Schreiber's false-arrest and illegal-imprisonment claims because Schreiber had already been convicted under Michigan's resisting-arrest statute.  The district court divided Schreiber's excessive-force claim into two segments:  the force Moe used in Schreiber's home while arresting him and the force Moe used once Schreiber was in the police car.  With respect to the force used before Schreiber was placed in the police car, the district court found that the *Heck* doctrine barred this claim and that, in any event, Schreiber was again entitled to qualified immunity.  The district court allowed the claim regarding the force Moe used after Schreiber was in the police car to proceed to trial.  Finally, the district court dismissed Schreiber's claim against Grand Rapids due to Schreiber's failure to offer any evidence regarding the city's training regime or its policies regarding officer misconduct.

Despite the fact that some portions of Schreiber's excessive-force claim escaped dismissal, the district court subsequently dismissed the entire case for failure to prosecute.  This Court, however, reversed that decision.  *Schreiber v. Moe*, 320 F. App'x 312 (6th Cir. 2008).  On remand, Schreiber voluntarily dismissed his remaining claim, but preserved the right to appeal the district court's previous adverse summary-judgment ruling.  The district court subsequently entered final judgment.

## II.  ANALYSIS

### A.  Scope and Standard of Review

This court reviews de novo a district court's decision to grant summary judgment.  *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 595 (6th Cir. 2009).  "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law."  *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 611 (6th Cir. 2009) (internal quotation marks omitted).

In his brief, Schreiber did not address his claim against Grand Rapids, nor did he address his claims of false arrest and illegal imprisonment.  Therefore, he has waived these claims.  *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005).  Thus, we will focus solely on Schreiber's claims of warrantless entry and excessive force.

**B.  Qualified Immunity**

Both Schreiber's warrantless-entry and excessive-force claims must be analyzed under the framework of the qualified-immunity doctrine.   Under that doctrine, "[g]overnment officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009).  In order to recover under 42 U.S.C. § 1983, Schreiber must show that:  (1) Moe violated one of Schreiber's constitutional rights and (2) that right was "clearly established" at the time of the violation.  *Id.* at 975 (internal quotation marks omitted). "A right is 'clearly established' if 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (brackets omitted).

**C.  Warrantless Entry**

Schreiber first argues that Moe violated Schreiber's clearly established Fourth Amendment rights when Moe entered Schreiber's home without a warrant.  "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009) (internal quotation marks omitted). "[T]hat presumption can be overcome," however, if "the exigencies of the situation . . . make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Id.* (internal quotation marks omitted). Exigency exists "where there are real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (internal quotation marks omitted).  In particular, as the

Supreme Court has recently reiterated, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Fisher*, 130 S. Ct. at 548 (internal quotation marks omitted). However, there must be "an objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid." *Id.* (internal quotation marks omitted). In civil cases, this question is normally left to the jury, but only if "there is room for a difference of opinion." *See Ingram v. City of Columbus*, 185 F.3d 579, 587 (6th Cir. 1999) (internal quotation marks omitted).

It is undisputed that Moe entered Schreiber's apartment without a warrant. Moe argues, however, that there was exigency because Schreiber may have been physically abusing Sarah. Preventing imminent or ongoing physical abuse within a home qualifies as an exigent circumstance, *Fisher*, 130 S. Ct. at 548, so the question becomes whether a reasonable jury could conclude that Moe did not have an "objectively reasonable basis for believing" that Sarah was in imminent danger. *Id*. We do not think a reasonable jury could reach such a conclusion, and so we conclude, as a matter of law, that Moe did not violate Schreiber's Fourth Amendment rights with respect to the warrantless entry.

Moe learned from the 911 dispatcher that a caller claimed to have heard screaming and believed that Sarah was being beaten by her parents. The caller claimed to have heard on the telephone the altercation as it was occurring. The caller asked to remain anonymous, which made it impossible for Moe or the dispatcher to assess the caller's credibility. *See Kerman v. City of New York*, 261 F.3d 229, 235-36 (2d Cir. 2001) (concluding that an anonymous 911 call, by itself, provides an insufficient basis for a finding of exigency); *cf. Florida v. J.L.*, 529 U.S. 266, 274 (2000) (holding that "an anonymous tip lacking indicia of reliability" that an individual is carrying a gun is not enough to justify a *Terry* stop). Even assuming that an anonymous 911 call by itself cannot supply the requisite indicia of exigency, however, we must consider in evaluating whether exigency exists any evidence observed by the police in the course of investigating the call. *See Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003).

As Moe arrived, he made several observations that corroborated the 911 caller's conclusion that Sarah was at risk of physical danger. Even before knocking on the door, Moe heard a male voice shouting from within the home. This by itself verified the 911 caller's observation that there had been shouting and suggested that, at the very least, some kind of altercation was occurring inside Schreiber's home. After Moe knocked on the door and told Schreiber that Moe was concerned about Sarah's welfare, Schreiber abruptly told Moe to leave and bombarded him with a slew of profanities. Under such circumstances, a reasonable officer would naturally question why a father, who had just been told that the police suspected his daughter was in danger, would be so hostile and uncooperative. *Cf. Thacker*, 328 F.3d at 254 (finding exigency based, in part, on the fact that a police officer was responding to a 911 call reporting a stabbing and was met by a belligerent occupant shouting profanities and providing no explanation). Furthermore, a reasonable jury would have to accept either Moe's testimony that he could not see Sarah before entering the home, or Schreiber's testimony that Moe could see her, but that she was crying, that her face was red, and that she was "hurt." Doc. 51-15 (Schreiber Dep. at 29). Under Moe's version, Moe's inability to see Sarah would have made it reasonable for him to investigate so that he could confirm that Sarah was okay. Under Schreiber's version, Sarah's visibly distraught demeanor would have led a reasonable police officer to believe that the girl was in distress and was consistent with the 911 caller's conclusion that Sarah was "getting beat."

Considering the evidence, even in the light most favorable to Schreiber, we conclude that no reasonable jury would dispute that Moe had an "objectively reasonable basis for believing" that Sarah was at risk of imminent injury. Moe knew that a 911 caller who had recently spoken with Sarah thought she was being beaten, and, upon investigating, Moe discovered an irate father so lacking in self-control that he shouted profanities at an officer who was simply checking on her welfare. It is true that this case lacks some of the more outward manifestations of violence that often support a finding of exigency. In particular, there were no signs of blood, *Thacker*, 328 F.3d 254, broken objects, *Fisher*, 130 S. Ct. at 547, or gunfire, *United States v. Huffman*, 461 F.3d 777, 784 (6th Cir. 2006); *Dickerson v. McClellan*, 101 F.3d 1151, 1159 (6th Cir. 1996). But

these are not prerequisites to a finding of exigency. As the Supreme Court has noted, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher*, 130 S. Ct. at 549 (internal quotation marks omitted). As in *Fisher*, here "[i]t sufficed to invoke the emergency aid exception that it was reasonable to believe that . . . [Schreiber] was about to hurt, or had already hurt, [Sarah]." *Id.*

Schreiber also argues that even if Moe is not liable for his warrantless entry into the apartment, Moe is liable for remaining there after he was able to confirm that Sarah was safe. We have observed that a warrantless intrusion into a home must not exceed the exigency that permits it. *See United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994). Once Moe entered Schreiber's apartment, however, the situation continued to deteriorate. Schreiber does not dispute Moe's testimony that Schreiber's home was chaotic and that there was a considerable amount of shouting. Furthermore, Schreiber continued to hurl obscenities at Moe while Moe was in the home and at some point Schreiber even threatened to have the "militia" kill Moe. Finally, while in the home, Moe spoke with a social worker on the telephone who advised that Sarah should leave the home and spend the night at a shelter. In light of these undisputed facts, we conclude that Moe could have reasonably believed that Schreiber was on the brink of violence and that, even if Moe had determined that Sarah was at that point unharmed, a continued police presence was required for a time to prevent any future harm. Therefore, we conclude that no reasonable jury could find that Moe violated the Fourth Amendment either by entering Schreiber's home or by remaining inside as long as he did.**5**

---

**5**Schreiber also argues that Moe unlawfully seized him when Moe allegedly "pushed [Schreiber] back down onto the couch" after Schreiber tried to stand up. Appellant Br. at 5-6, 10. We have identified nothing in the record that substantiates this claim. Schreiber's brief cites "Tr." pages sixty-one and sixty-two, yet there are no documents in the record which have any relevant information on those pages. Schreiber appears to be referring to portions of Moe's preliminary examination that were never made part of the record.

**D. Excessive Force**

Schreiber also argues that Moe used excessive force against him after Schreiber shattered the balcony door and re-entered the apartment. "'[*A*]*ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In determining whether an officer's use of force was reasonable, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). In doing so, we "pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396). Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In assessing Schreiber's excessive-force claim, we must construe all of the facts in the record "in the light most favorable" to Schreiber. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005). Once we have done so, "the question whether [Moe's] actions were objectively unreasonable is 'a pure question of law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

Schreiber asserts that he was in control of his behavior and walked back into the apartment from the balcony with his hands down. According to his deposition, Schreiber attests that he never assaulted Moe or threatened to do so. Schreiber further contends that Moe knocked him down, pushed his face into broken glass, turned him over, and then punched him over twenty times. A reasonable jury could accept this account as true despite Moe's contrary testimony, and under these facts Moe used excessive force. Accepting as true Schreiber's claim that he did not try to strike Moe, as we must for

summary judgment purposes notwithstanding Moe's fervent denials of any use of force beyond self-defense, it is difficult to conceive of a law-enforcement interest that would have been served by punching Schreiber in the face over twenty times with enough force to fracture his facial bones. *See Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (finding that police officers "could not have justified striking [the plaintiff] in the eye with a stick ten to twelve times while she was on the ground and 'out of it'" even if some force was required to place handcuffs upon her). Indeed, the decision to punch repeatedly an unarmed suspect who asserts that he never so much as lifted his hands amounts to little more than the wanton infliction of pain. Moreover, Schreiber testified that Moe "turned me around and whatever and put handcuffs on me *and he kept on beating me up.*" Doc. 51-16 (Schreiber Dep. at 46) (emphasis added). Construing this statement in the light most favorable to Schreiber, we understand Schreiber to be claiming that Moe continued to punch him even after the handcuffs were in place. Furthermore, as we have previously held, striking a neutralized suspect who is secured by handcuffs is objectively unreasonable. *See McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003). Therefore, under this view of the facts, Moe violated Schreiber's right to be free from excessive force.

We also conclude that Schreiber's right to be free from excessive force was clearly established, so that Moe is not entitled to qualified immunity.[6] The relevant question here is "whether it would be clear to a reasonable officer that [Moe's] conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808 (2009). Here, cases like *McDowell* and *Phelps* provide examples of factually similar cases decided before the incident in question where we have found an officer's alleged use of force to be

---

[6]Moe argues that Schreiber effectively waived the qualified-immunity issue on appeal because his brief offered so little analysis of this issue. Although we agree that the quality and thoroughness of Schreiber's brief was far from ideal, we do not think it amounted to a waiver. Schreiber does set forth the general rules that govern qualified immunity. Appellant Br. 16-17. He also points out, albeit in a different section, that "[t]he right to be free from excessive force is a clearly established right," and notes that there is a factual dispute as to whether Moe threw him to the ground despite lack of provocation. Appellant Br. at 18. Unfortunately, in dismissing the qualified immunity issue as waived, Moe's brief also fails to offer any meaningful analysis with respect to this issue.

excessive. Similarly, even if this case presented a novel factual situation, we still conclude that Schreiber's right to not be punched in the face twenty times as he lay on the floor was sufficiently "'obvious'" to put Moe on notice. *See Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Nonetheless, the district court reasoned that Moe was entitled to qualified immunity given Schreiber's aggressive behavior and the "rapidly developing circumstances" with which Moe was faced. Doc. 61 (Dist. Ct. Op. at 32). The district court, however, provided no explanation as to how the need to control or restrain Schreiber justified repeatedly punching him in the face, especially when Schreiber attests that he never tried to strike Moe. Similarly, the district court failed to take into account Schreiber's testimony that Moe's punches continued even after Schreiber was in handcuffs. When the evidence is viewed in the light most favorable to Schreiber, this is not a situation on "the sometimes hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206 (internal quotation marks omitted). Therefore, we conclude that the qualified-immunity doctrine does not prevent Schreiber from proceeding on his excessive-force claim.

In reaching this conclusion that Schreiber may go forward with his excessive-force claim, we acknowledge that Schreiber's deposition testimony is at times inconsistent both with itself and with his prior statements. We emphasize, however, that "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (internal quotation marks omitted). "[W]hen the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). This is the case even when the nonmovant's account is contradictory. *See Shreve*, 453 F.3d at 688 (crediting plaintiff's testimony of instances of excessive force for summary-judgment purposes despite contradictions in her deposition); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 340 (6th Cir. 2008) (noting that, for summary-judgment purposes, inconsistencies in plaintiff's allegations "go to the weight of her testimony, not its admissibility").

The district court also found Schreiber's § 1983 claim of excessive force to be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because Schreiber had already been convicted in state court for attempting to resist his arrest. We disagree.

In *Heck*, the Supreme Court held that

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87. Schreiber's conviction has not been reversed, so the question is whether his § 1983 suit is an attempt to invalidate that conviction. The district court reasoned that because "the altercation between Schreiber and Officer Moe gave rise to both the conviction and the excessive force claim," Doc. 61-1 ( Dist. Ct. Op. at 25), the § 1983 suit constituted an effort to invalidate the conviction. Our case law, however, requires a more precise inquiry whereby "the court must look both to the claims raised under § 1983 *and* to the specific offenses for which the § 1983 claimant was convicted." *Swiecicki v. Delgado*, 463 F.3d 489, 493 (6th Cir. 2006), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007). The mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant if the two are consistent with one another.

Generally speaking, "a claim of excessive force does not necessarily relate to the validity of the underlying conviction and therefore may be immediately cognizable." *Swiecicki*, 463 F.3d at 493. Indeed, in Michigan, one can be convicted under § 750.81d(1) simply for a "knowing failure to comply with a lawful command," Michigan Compiled Laws § 750.81d(7)(a), and the mere failure of Schreiber to obey a police order would not have made the force Moe allegedly used reasonable. There are two circumstances, however, in which an excessive-force claim might conflict with a conviction. The first is when the criminal provision makes the lack of excessive force an element of the crime. *Cf. Heck*, 512 U.S. at 486 n.6. The second is when excessive

force is an affirmative defense to the crime, as was true in the case upon which the district court relied, *Cummings v. City of Akron*, 418 F.3d 676, 684 (6th Cir. 2005) (noting that an assault conviction barred an excessive-force claim because the plaintiff did not raise excessive force as a defense). In both of these circumstances, the § 1983 suit seeks a determination of a fact that, if true, would have precluded the conviction.

Nothing in the text of Michigan Compiled Laws § 750.81d(1) or § 750.92 suggests that the state must prove as an element of the crime that the police did not use excessive force. Indeed, the Court of Appeals of Michigan has found that a lawful arrest is not one of the elements of § 750.81d(1). *People v. Ventura*, 686 N.W.2d 748, 752 (Mich. Ct. App. 2004). Furthermore, one recent Michigan case has strongly suggested that excessive force by the police is not a defense to a resisting-arrest conviction, *People v. Hill*, No. 283951, 2009 WL 1830750, at *3 (Mich. Ct. App. June 25, 2009) (stating that there is no authority for the proposition that the "use of excessive force by police is a valid defense to resisting and obstructing"), and several others have left unresolved the question of whether excessive force is a defense. *See, e.g.*, *People v. Burks*, No. 284467, 2009 WL 1693743, at *2 (Mich. Ct. App. June 16, 2009); *People v. Rauch*, No. 263185, 2006 WL 3682754, *3-4 (Mich. Ct. App. Dec.14, 2006). In light of these state court of appeals decisions, we cannot conclude that any excessive force used by Moe would have provided Schreiber with an affirmative defense to the charge of resisting an arrest.

We conclude that under these circumstances, Schreiber's § 1983 excessive-force claim does not challenge his conviction for attempting to resist his arrest. *See Rogers v. Detroit Police Dep't*, 595 F. Supp. 2d 757, 768-70 (E.D. Mich. 2009) (reaching a similar conclusion). The *Heck* doctrine applies only where a § 1983 claim would "*necessarily*" imply the invalidity of a conviction. *Nelson v. Campbell*, 541 U.S. 637, 647 (2004) (internal quotation marks omitted). "To hold otherwise [would be to] cut off [a] potentially valid damages action[] as to which [Schreiber] might never obtain favorable termination — [a] suit[] that could otherwise have gone forward had [Schreiber] not been convicted." *Id.* Therefore, Schreiber should be permitted to proceed on his claim that Moe used excessive force during the course of the arrest.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment with respect to Schreiber's warrantless-entry claim, and **REVERSE** the district court's judgment with respect to Schreiber's excessive-force claim.  We **REMAND** for further consideration consistent with this opinion.