RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0155p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PHILLIP CORDELL,

*Plaintiff-Appellant,*

No. 13-4203

v.

GLEN MCKINNEY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:11-cv-00231—Timothy S. Black, District Judge.

Argued: June 25, 2014

Decided and Filed: July 16, 2014

Before: MOORE and KETHLEDGE, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** Margaret McKay, OHIO JUSTICE & POLICY CENTER, Cincinnati, Ohio, for Appellant. Joshua R. Schierloh, SURDYK, DOWD & TURNER CO., L.P.A., Miamisburg, Ohio, for Appellee. **ON BRIEF:** David Singleton, OHIO JUSTICE & POLICY CENTER, Cincinnati, Ohio, for Appellant. Joshua R. Schierloh, SURDYK, DOWD & TURNER CO., L.P.A., Miamisburg, Ohio, for Appellee.

---

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   Phillip Cordell filed suit under 42 U.S.C. § 1983 alleging that Deputy Sheriff Glen McKinney ran afoul of the Constitution's guarantees under the Eighth Amendment when he slammed Cordell, who was handcuffed and restrained, headfirst into a concrete wall.   The district court rejected Cordell's suit, granting summary judgment and qualified immunity to Deputy McKinney.  A genuine dispute as to several material facts exists, however, and if Cordell's version of events is credited, a reasonable jury could conclude that Deputy McKinney inflicted serious pain upon Cordell with malicious and sadistic intent.   Moreover, we conclude that any reasonable jail official would know that the Eighth Amendment prohibits the conduct that Cordell accuses Deputy McKinney of exhibiting in the particular factual circumstances in which that conduct occurred.  As a result, we **REVERSE** the district court's grants of summary judgment and qualified immunity, and we **REMAND** for further proceedings consistent with this opinion.

## I.  FACTS & PROCEDURAL HISTORY

From November 7, 2008 until July 23, 2009, Cordell was an inmate at the Greene County Jail in Xenia, Ohio.  R. 26-1 at 20:7–17 (Cordell Dep.) (Page ID #133).  On July 13, he pleaded guilty to involuntary manslaughter.  *Id.* at 17:2–16 (Page ID #130).  Afterwards, Cordell was in a cell on the second floor of the jail as he awaited transfer to a state penitentiary to serve his sixty-month sentence.  *Id.* at 19:13–15 (Page ID #132).

In the late afternoon of July 20, McKinney was the deputy sheriff charged with overseeing the inmates on the second floor.  R. 29 at 12:8–14 (McKinney Dep.) (Page ID #249).  As Deputy McKinney performed his initial rounds on the floor, several inmates, including Cordell, requested haircuts.  *Id.* at 12:15–18 (Page ID #249).  According to Cordell, Deputy McKinney responded to this request by stating, "'Don't fuck with me about being put on the haircut list, or your sorry ass won't get one.'"  R. 26-1 at 26:15–16 (Cordell Dep.) (Page ID #139).  Perhaps unsurprisingly, Deputy McKinney remembers his statement being less vulgar.

*See* R. 29 at 12:17–23 (McKinney Dep.) (Page ID #249).  Both parties, however, agree that Cordell responded with some version of "'Fuck you, you sawed-off piece of shit.'"  R. 26-1 at 26:17–18 (Cordell Dep.) (Page ID #139); *see also* R. 29 at 15:7 (McKinney Dep.) (Page ID #252).

This outburst did not sit well with Deputy McKinney.  He commanded Cordell to step into the vestibule area so that Deputy McKinney could place Cordell in handcuffs and escort him to a holding cell on the third floor of the jail.  R. 29 at 16:2–4 (McKinney Dep.) (Page ID #253).  Cordell claimed that he "was in complete compliance" with Deputy McKinney's commands.  R. 26-1 at 31:14 (Cordell Dep.) (Page ID #144).  In contrast, Deputy McKinney stated that Cordell was "verbally aggressive," "not listening to [Deputy McKinney's] commands," and "getting the rest of the block . . . agitated."  R. 29 at 16:5–8, 17:6–7 (McKinney Dep.) (Page ID #253, 254).  This behavior, according to Deputy McKinney, forced him to display his Taser and call for backup.  *Id.* at 16:18–24 (Page ID #253).  Correctional Officer Brian Marzluf responded first, and Deputy McKinney handed him the Taser and began to handcuff Cordell.  *Id.* at 17:23–18:5 (Page ID #254–55); R. 30 at 11:5–10 (Marzluf Dep.) (Page ID #351).  By the time Deputy McKinney finished placing Cordell in handcuffs, Sergeant David Jones and Deputy Sheriff William Coe arrived on the cellblock.  R. 32 at 14:26–19 (Jones Dep.) (Page ID #420); R. 33 at 13:13–17 (Coe Dep.) (Page ID #467).

Deputy McKinney then placed Cordell "[i]n an escort position" and began leading him to the third-floor holding cell.  R. 29 at 19:25 (McKinney Dep.) (Page ID #256).  Cordell described this position as "[w]hen your hands are behind your back and somebody tries to raise them laterally up toward your shoulders, it's a submission[-style hold]."  R. 26-1 at 33:15–19 (Cordell Dep.) (Page ID #146).  Having put Cordell in this position, Deputy McKinney began to move Cordell "in a brisk fashion."  *Id.* at 33:19–20 (Page ID #146); *see also* R. 32 at 17:8–9 (Jones Dep.) (Page ID #423) ("Deputy McKinney did move [Cordell] at a brisk pace."); R. 33 at 17:6–14 (Coe Dep.) (Page ID #471) (acknowledging that Deputy McKinney was walking Cordell quickly).  Deputy McKinney, Cordell, and the other officers traveled through the second-floor office and up a flight of stairs without incident.  *See* R. 26-1 at 33:24–34:25 (Cordell Dep.) (Page ID #147); Security Video, Cordell 1 at 17:12:35.44–17:12:40.52.

Near the top of the stairs, Deputy McKinney and Cordell paused. Deputy McKinney "double-locked" Cordell's handcuffs, preventing them from tightening further, and waited for the other officers to reach the landing. R. 26-1 at 35:1, 35:17–24 (Cordell Dep.) (Page ID #148). While the procession was stopped, Nurse Deborah Jordan joined the group. R. 31 at 11:4–7 (Jordan Dep.) (Page ID #380). Then, Deputy McKinney started to march Cordell down the third-floor hallway. R. 26-1 at 37:20–25 (Cordell Dep.) (Page ID #150). This hallway "does a dogleg, goes down 30, 40 feet, turns to the right, [and] immediately turns to the left." *Id.* at 37:17–19 (Page ID #150). According to Cordell, "[Deputy] McKinney start[ed] pushing [him] faster and faster [down this hallway] and raising [Cordell's] arms behind [Cordell's] back." *Id.* at 37:21–23 (Page ID #150). Cordell "tried to turn around to see what [McKinney's] intentions [were], why he [was] trying to push [Cordell] so fast." *Id.* at 41:16–17 (Page ID #154). In response, Cordell claimed, Deputy McKinney ran him "head first into the wall" with force sufficient to lacerate Cordell's forehead, cause severe neck and back pain, and leave him "very, very groggy." *Id.* at 61:17–23 (Page ID #174); *id.* at 57:22 (Page ID #170).

Deputy McKinney described this sequence of events differently. According to Deputy McKinney, he walked Cordell "at a steady pace . . . , a pace that [he knew he] need[ed] to move [Cordell at] to get him where [Deputy McKinney] want[ed] him to go so [the officers] [could] . . . control the situation." R. 29 at 70:14–15, 70:20–22 (McKinney Dep.) (Page ID #307). Deputy McKinney stated that Cordell "start[ed] tensing up" in the hallway and that Deputy McKinney warned Cordell to stop. *Id.* at 19:15, 19:19–20 (Page ID #256). When Cordell failed to face forward, Deputy McKinney "placed him against the wall within the hallway." *Id.* at 19:21–22 (Page ID #256). In Deputy McKinney's opinion, he "used the minimum amount of force necessary to control . . . Inmate Cordell." *Id.* at 27:17–18 (Page ID #274).

The security video captures Deputy McKinney and Cordell entering the empty hallway. Security Video, Cordell 2 at 17:12:55.67. It also shows Cordell turning his head toward Deputy McKinney, who has Cordell's arms secured. *Id.* at 17:12:57.01–17:12:57.81. On the video, Deputy McKinney responds to Cordell's turn by directing him toward the wall, *id.* 17:12:57.27–17:12:58.08, but Deputy McKinney and Cordell move outside the camera's view before Cordell makes contact with the wall, *id.* at 17:12:58.34. The video shows Sgt. Jones, Deputy Coe,

Correctional Officer Sortman, Officer Marzluf, and Nurse Jordan surrounding Deputy McKinney and Cordell. *Id.* at 17:12:58.61–17:13:07.54. Approximately twenty-five seconds after Deputy McKinney and Cordell exit the view of the camera, the group—minus Nurse Jordan—begin moving onward. *Id.* at 17:13:22.77. After Cordell and the officers appear to leave, the video shows Nurse Jordan pointing at the wall. *Id.* at 17:13:31.04–17:13:32.38. In her deposition, Nurse Jordan testified that she was pointing at fresh blood on the wall. R. 31 at 13:10–19 (Jordan Dep.) (Page ID #382). Nurse Jordan also stated that she noticed blood droplets on the floor from Cordell's wound. *Id.* at 16:3–14 (Page ID #385).

After the incident in the third-floor hallway, Deputy McKinney, Cordell, and the other officers continued on to the holding cells without incident. R. 29 at 77:4–82:11 (McKinney Dep.) (Page ID #314–19). Once Deputy McKinney and Cordell were in the holding cell, however, they started "having a heated discussion, [a] debate about why [Cordell] was pulled out and to why [Deputy McKinney] did—[what] [Deputy McKinney's] actions were and [Cordell's] actions were." *Id.* at 83:19–21 (Page ID #320). Sgt. Jones directed Deputy McKinney to cease arguing with Cordell; Deputy McKinney did not comply, and Sgt. Jones removed Deputy McKinney from the scene. R. 32 at 28:1–16 (Jones Dep.) (Page ID #434); R. 29-3 at 1 (Jones Report) (Page ID #334).

With Deputy McKinney out of the cell, Nurse Jordan started assessing and treating Cordell's wounds. According to Cordell, "everything hurt—[his] head, [his] neck, [his] back, [his] shoulders from being raised up, but all in combination." R. 26-1 at 61:18–20 (Cordell Dep.) (Page ID #174). Nurse Jordan found "a little cut above his eye," and she bandaged it. R. 31 at 14:3–4 (Jordan Dep.) (Page ID #383. Deputy Coe, who took Deputy McKinney's place in the holding cell, stated that blood "was trickling down . . . [the] side of [Cordell's] face from his brow." R. 33 at 21:25–22:1 (Coe Dep.) (Page ID #475–76). Nurse Jordan and the officers then left Cordell to calm down.

When Sgt. Jones returned to the holding cell thirty to forty-five minutes later, Cordell asked "to file a complaint of excessive force" against Deputy McKinney. R. 32 at 34:20 (Jones Dep.) (Page ID #440). Sgt. Jones took a report. *See* R. 29-5 at 1 (Complaint Summary) (Page ID #336). In the accompanying witness statement, Cordell alleged that Deputy McKinney "lost

his temper" and "ran [Cordell's] head into the wall . . . under the video camera in the [third-floor] hall." R. 29-9 at 1 (Witness Statement) (Page ID #340). Later, as a result of this complaint, Deputy McKinney received "a written [warning] for excessive use of force." R. 29 at 31:10–11 (McKinney Dep.) (Page ID #268).

When Nurse Jordan returned to check on Cordell, he continued to complain that he was in severe pain and needed stitches for the laceration in his head. R. 26-1 at 66:20–25 (Cordell Dep.) (Page ID #179); R. 31 at 17:17–25 (Jordan Dep.) (Page ID #386). Later in the evening of July 20, Cordell went to Greene County Memorial Hospital. The doctors noted that Cordell complained of "neck pain when moving side to side." R. 36-1 at 6 (Hospital Records) (Page ID #518). The hospital records indicated that Cordell's "[n]eck was supple with no reproducible cervical spine tenderness," *id.* at 11 (Page ID #523), but the doctors diagnosed him with "whiplash," *id.* at 5 (Page ID #517), and "[n]eck pain following whiplash-type injury," *id.* at 11 (Page ID #523). Cordell returned to the jail with five stitches, and on July 23, he was transferred to Chillicothe Correctional Institute. R. 26-1 at 16:9–11 (Cordell Dep.) (Page ID #129).

On July 1, 2011, Cordell filed this suit under 42 U.S.C. § 1983, alleging that Deputy McKinney violated his right to be free from cruel and unusual punishments under the Eighth and Fourteenth Amendments. R. 1 at 4 (Compl.) (Page ID #4). On October 2, 2012, Deputy McKinney filed a motion for summary judgment, claiming that Deputy McKinney used only reasonable force and that he is entitled to qualified immunity. R. 19 at 13, 16–18 (Mot. for Summ. J. at 12, 15–17) (Page ID #77, 80–82). Cordell countered with a declaration from Dr. Richard Bozian, stating that Deputy McKinney's conduct "aggravated a preexisting but asymptomatic degenerative pathology in Mr. Cordell's neck." R. 36-1 at 2 (Dr. Bozian Decl.) (Page ID #514). Deputy McKinney moved to strike this declaration. R. 37 at 1 (Mot. to Strike) (Page ID #527).

On September 24, 2013, the district court granted Deputy McKinney's motion for summary judgment. It found that Cordell's allegations of excessive force were "uncorroborated" and that Deputy McKinney was justified in using the amount of force that he did. R. 42 at 17, 19 (D. Ct. Op.) (Page ID #609, 611). The district court, in the alternative, also granted Deputy McKinney's motion on grounds of qualified immunity, finding that "no reasonable jury could

rely on [Cordell's] account and that the force utilized was reasonable as a matter of law." *Id.* at 20 (Page ID #612).  This appeal follows.

## II.  STANDARD OF REVIEW

We review de novo a district court's order granting summary judgment.  *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party."  *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).  Importantly, at this stage in the litigation, we must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary-judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  "When opposing parties tell two different stories, [however,] one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, [we need] not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 380.  However, "[f]acts that are not blatantly contradicted by [a video] recording remain entitled to an interpretation most favorable to the non-moving party."  *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011).

## III.  ANALYSIS

Cordell contends that the district court erred in finding (1) that Deputy McKinney did not violate Cordell's Eighth Amendment rights and (2) that, even if the deputy did, he was entitled to qualified immunity because those rights were not clearly established.  In a sense, the district court sided with Deputy McKinney on both prongs of the qualified-immunity analysis, which asks "whether a constitutional right would have been violated on the facts alleged" and "whether the right at issue was clearly established at the relevant time."  *Plumhoff v. Rickard*, --- U.S. ---, 134 S. Ct. 2012, 2020 (2014) (internal quotation marks omitted).  While we may evaluate either prong first, *Pearson v. Callahan*, 555 U.S. 223, 227 (2009), we take the prongs up in order and conclude that the district court erred in making both findings.  Thus, we hold that Deputy McKinney is not entitled to qualified immunity, we **REVERSE** the district court's grant of summary judgment, and we **REMAND** for further proceedings consistent with this opinion.

**A.  Constitutional Violation**

The Eighth Amendment prohibits the imposition of "cruel and unusual punishments" upon prisoners.  U.S. Const. amend. VIII.  But not every shove or restraint gives rise to a constitutional violation.  *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986).  On occasion, "[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law."  *Combs*, 315 F.3d at 556 (citing *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)).  Prison officials nonetheless violate the Eighth Amendment when their "offending conduct reflects an unnecessary and wanton infliction of pain."  *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (internal quotation marks omitted); *Bailey v. Golladay*, 421 F. App'x 579, 582 (6th Cir. 2011).

There is an objective component and a subjective component to an Eighth Amendment claim.  *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)).  First, "[t]he subjective component focuses on the state of mind of the prison officials."  *Williams*, 631 F.3d at 383.  We ask "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillan*, 503 U.S. 1, 7 (1992).  Second, "[t]he objective component requires the pain inflicted to be 'sufficiently serious.'"  *Williams*, 631 F.3d at 383 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  This component requires a "contextual" investigation, one that is "responsive to 'contemporary standards of decency.'"  *Hudson*, 503 U.S. at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred.  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident."  *Hudson*, 503 U.S. at 9.  "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."  *Id.*

The district court determined that Cordell failed to demonstrate a genuine dispute of material facts with regard to both components.  In reaching this conclusion, however, the district court improperly weighed the evidence in the record.  Viewing the evidence "in the light most

favorable to [Cordell]," as we must, we conclude that a reasonable jury could find that Cordell has demonstrated that Deputy McKinney violated his Eighth Amendment right to be free from excessive force. *Scott*, 550 U.S. at 380.

## 1. Subjective Component

We begin with the subjective component. In determining whether a prison official had a culpable state of mind, we have found it helpful to consider "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted," as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (internal quotation marks omitted; alteration in original). Considering these factors and the record in Cordell's favor, we conclude that a reasonable jury could find that Deputy McKinney acted with malicious and sadistic intent to cause harm.

To start, there is a question of whether Deputy McKinney had a plausible justification for applying any force to Cordell. In evaluating this factor, we recognize that "prison officials 'must make their decisions in haste under pressure, and frequently without the luxury of a second chance.'" *Combs*, 315 F.3d at 557 (quoting *Hudson*, 503 U.S. at 6). Therefore, "[t]he issue is . . . not whether the use of force was absolutely necessary in hindsight, but whether the use of force could plausibly have been thought necessary . . . ." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (internal quotation marks omitted).

In this case, Deputy McKinney claimed that Cordell "tensed up [and] turned into [him]" as he escorted Cordell down the third-floor hallway, R. 29 at 67:8–13 (McKinney Dep.) (Page ID #304), an action that various jail officials testified could justify placing an inmate against the wall or taking him down to the floor in an effort to reassert control over the inmate, *see* R. 32 at 23:14–20 (Jones Dep.) (Page ID #429); R. 33 at 28:1–3 (Coe Dep.) (Page ID #482). Cordell did not dispute that the use of some force could be appropriate when an inmate turns toward a guard, and our prior decisions indicate that prison officials may use appropriate force to regain control of an aggressive inmate. *See, e.g.*, *Griffin*, 604 F.3d at 954–55. While the videotape of the encounter does not clearly show that Cordell voluntarily turned his body toward Deputy

McKinney,[1] Cordell acknowledged that he "turn[ed] and attempt[ed] to face [Deputy McKinney]." R. 26-1 at 44:5–7 (Cordell Dep.) (Page ID #157). Accordingly, we must conclude that there is no genuine dispute as to whether Deputy McKinney had a reasonable basis for using *some* force against Cordell.[2]

The fact that Deputy McKinney had a plausible basis for using some force, however, does not end our inquiry. We must consider the relationship between the need to use force and the amount of force used. In other words, we ask whether Deputy McKinney had a reasonable basis for using the amount of force that he did when Cordell turned toward him.

This inquiry is complicated by a genuine dispute as to how much force Deputy McKinney actually employed. All agree that Cordell turned to some extent and that Deputy McKinney pushed Cordell against the wall in response. But the record does not conclusively show *how* Cordell contacted the wall. Deputy McKinney testified that he used only "the minimum amount of force necessary to control . . . Inmate Cordell." R. 29 at 37:17–18 (McKinney Dep.) (Page ID #274). The other officers agreed with his assessment. *See* R. 32 at 35:15–16 (Jones Dep.) (Page ID #441); R. 33 at 27:22–24 (Coe Dep.) (Page ID #481). Contrary to these statements, however, Cordell claimed that Deputy McKinney raised Cordell's cuffed arms up, pushed his torso down, and intentionally rammed him "head first into the wall." R. 26-

---

[1]The videotape confirms that Cordell did turn his head toward Deputy McKinney. Security Video, Cordell 2 at 17:12:56.21; *see also* R. 29 at 66:1–4 (McKinney Dep.) (Page ID #303). But the videotape is ambiguous on whether Cordell voluntarily turned his body into Deputy McKinney. Deputy McKinney testified that, at 17:12:57.01 on the videotape, Cordell turned into him. R. 29 at 66:7–16 (McKinney Dep.) (Page ID #303). Based on our review of the videotape, however, it is not clear that Cordell turned his body voluntarily toward Deputy McKinney. For instance, at 17:12:57.01, when Deputy McKinney claims that Cordell turned into him, Cordell's weight appears to be predominantly on his right foot (the foot closest to Deputy McKinney), and his left foot is raised to step forward. Security Video, Cordell 2. A reasonable jury could find that it would be unnatural for Cordell's legs to be in such a position if he were making an aggressive turn toward the deputy. Moreover, at all relevant points in the hallway, Cordell's feet remain pointed and moving forward, another fact that a reasonable jury might find to cast doubt upon the necessity of using force.

[2]Deputy McKinney also claimed that Cordell "tens[ed] up his arms and pull[ed] away from [the deputy]." R. 29-4 at 1 (McKinney Report) (Page ID #335). Cordell denied these allegations, *see* R. 26-1 at 31:16–17 (Cordell Dep.) (Page ID #144) (stating that he "complied completely"), and the videotape does not show any resistance on Cordell's part, *see* Security Video, Cordell 2 at 17:12:55.67–17:12:58.61. Additionally, Deputy McKinney stated that he warned Cordell to stop his behavior, R. 29 at 67:10–11 (McKinney Dep.) (Page ID #304), but Cordell also denied that this warning took place, R. 26-1 at 44:8–16 (Cordell Dep.) (Page ID #157), and the videotape does not show Deputy McKinney speaking in the hallway, *see* Security Video, Cordell 2 at 17:12:55.67–17:12:58.08. Therefore, at this stage in the litigation, we adopt Cordell's version of events and consider Cordell's turn toward Deputy McKinney to be the only justification for using any force. *See Coble*, 634 F.3d at 870.

1 at 42:14–15 (Cordell Dep.) (Page ID #155).  As a result, we have two irreconcilable stories regarding what happened.

Taking Cordell's version of events as true, as we must do at this stage of the litigation, we conclude that a reasonable jury could find that Deputy McKinney lacked a good-faith reason to use Cordell as a human battering ram.  We reach this conclusion for several reasons.  First, there is the severity of Cordell's injuries.  The record indicates that Cordell suffered a laceration, R. 26-1 at 66:20–25 (Cordell Dep.) (Page ID #179); that the laceration bled on the wall, on the hallway floor, and on Cordell's face, R. 31 at 14:2–5 (Jordan Dep.) (Page ID #383); *id.* at 16:3–11 (Page ID #385); R. 33 at 21:25–22:1 (Coe Dep.) (Page ID #475–76); and that, ultimately, Cordell needed five stitches to close the wound,[3] R. 36-1 at 5 (Hospital Records) (Page ID #517).  The record also indicates that Cordell immediately complained of head and neck pain, R. 26-1 at 60:7–18 (Cordell Dep.) (Page ID #173), and the hospital records lend some credence[4] to these complaints, given their notations that Cordell suffered "whiplash" and a "neck strain," R. 36-1 at 5, 9 (Hospital Records) (Page ID #517, 521).  In addition, Dr. Bozian subsequently interpreted these records to show that Deputy McKinney's use of force created "a shift in the axis to the left of the odontoid process," a shift that "aggravated a preexisting but asymptomatic degenerative pathology" and led to "chronic pain syndrome."  *Id.* at 2 (Dr. Bozian Decl. at ¶¶ 6–7 (Page ID #514).  These data points, if read in Cordell's favor, suggest that Deputy McKinney used a considerable amount of force against Cordell.  The use of such force, while certainly not dispositive, makes it more likely that Deputy McKinney acted with malice.

Second, it is difficult to reconcile the threat that Cordell's turn toward Deputy McKinney presented to the deputy, other prison officials, other inmates, or outside individuals with the amount of force that Cordell claims that Deputy McKinney used.  Cordell's arms were cuffed

---

[3]The district court credited Nurse Jordan's statement that Cordell exacerbated his wound by pulling it open once he returned to his second-floor cell.  *See* R. 42 at 14 (D. Ct. Op.) (Page ID #606); *see also* R. 31 at 18:2–24) (Jordan Dep.) (Page ID #387).  Cordell denied this accusation.  *See* 26-1 at 70:14–23 (Cordell Dep.) (Page ID #183).  The district court recognized this denial, *see* R. 42 at 14 (D. Ct. Op.) (Page ID #606), yet inexplicably credited Nurse Jordan's testimony, *id.*  At this stage in the litigation, making credibility determinations and weighing the evidence is entirely inappropriate.  *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010).

[4]The records also state that Cordell's neck was "supple."  R. 36-1 at 11 (Hospital Records) (Page ID #523).  To the extent that this statement contradicts the above-cited comments in the hospital records, we must adopt Cordell's version of his injuries at this stage in the litigation.

behind his back, and Deputy McKinney had Cordell in a submission hold. *See, e.g.*, Security Video, Cordell 2 at 17:12:56.74; R. 29 at 57:17–58:14 (McKinney Dep.) (Page ID #294–95). Deputy McKinney was moving Cordell through a hallway inside the Greene County Jail, and the only other people in the hallway were two correctional officers. *See* Security Video, Cordell 2 at 17:12:57.81. It is hard to understand—even being deferential to Deputy McKinney's split-second judgment—how a prisoner in such an incapacitated position would present a sufficient threat to justify the extreme use of force that Cordell accused Deputy McKinney of using. *See United States v. Graham*, 275 F.3d 490, 511 n.11 (6th Cir. 2001) (noting that a defendant "had already been placed in handcuffs" when the agents started their search and "could no longer legitimately be considered a threat to them"). Moreover, Sgt. Jones—the prison official following directly behind Deputy McKinney and Cordell—stated in his incident report that he "did not observe any movement or action by Inmate Cordell that would indicate any immenient [sic] danger . . . ." R. 29-3 at 1 (Jones Report) (Page ID #334). Given these facts in the record, a jury would not be unreasonable in concluding that the only explanation for Deputy McKinney slamming Cordell headfirst into the wall was a malicious intent to injure.

Third, there is no evidence in the record that Deputy McKinney made any effort to moderate the force he used against Cordell except his bare assertion that he "used the minimum amount of force necessary to control . . . Cordell." R. 29 at 37:17–18 (McKinney Dep.) (Page ID #274). Rather, Deputy McKinney's fellow officers described him as "forcibly escort[ing]" Cordell, R. 29-3 at 1 (Jones Report) (Page ID #334), and "escort[ing] him . . . in an aggressive manner," R. 29-7 at 1 (Coe Report) (Page ID #338). Deputy McKinney had to be "asked twice . . . to calm down" once he had placed Cordell into the holding cell. *Id.* Moreover, when the deputy failed to do so and his "agitated state" continued, Sgt. Jones "relieved [D]eputy McKinney." *Id.* Additionally, Deputy McKinney accepted "a written [warning] for excessive use of force" from the Sheriff's Department as a result of this incident.[5] R. 29 at 31:10–11

---

[5] Deputy McKinney correctly argues that this reprimand is insufficient to satisfy the objective component of an Eighth Amendment violation, *see* Appellee Br. at 21 (citing *Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir. 1992)), but an internal sanction may be relevant to determining whether Deputy McKinney had a culpable state of mind. *See Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 690 n.5 (E.D. Mich. 2011) (noting that "*Smith* did not rule that such [sanctions] could not be considered by a fact finder, only that they cannot be understood to define the constitutional boundaries by which an officer's conduct is to be judged"). A reasonable jury could conclude that the fact that Deputy McKinney accepted a reprimand, rather than insisting that his use of force was appropriate, cuts against his contentions here.

(McKinney Dep.) (Page ID #268).  Given these three factors, we conclude that a reasonable jury could find that Deputy McKinney's use of force was not a good-faith effort to restore control of Cordell, but rather a malicious and sadistic attempt to inflict injury.

Deputy McKinney offers several counterarguments in his briefing, but none are persuasive.  First, Deputy McKinney directs us to the videotape, which he claims "documents [Deputy] McKinney escorting [Cordell] through the third floor intake in an upright position," and argues that it "clearly contradict[s]" Cordell's allegations.  Appellee Br. at 23. Unfortunately for all involved, the videotape does not provide conclusive answers.  At 17:12:57.01 of the videotape, the moment at which Deputy McKinney claims Cordell turned into him, Cordell's torso is relatively upright.  Security Video, Cordell 2.  At 17:12:57.27, however, Deputy McKinney starts to raise Cordell's arms behind his back, and by 17:12:58.08, it appears that Cordell's torso has started to fall forward.  *Id.*  In the next frame, at the approximate point when Cordell contacts the wall, he has fallen outside of the security camera's view.  *Id.* at 17:12:58.34.  If, as Cordell claimed, his torso continued to fall forward to the point where Deputy McKinney rammed Cordell headfirst into the wall, a jury would not be unreasonable in concluding that Deputy McKinney's response to Cordell's turn was so disproportionate as to indicate a sadistic intent to injure Cordell.  But again, the critical action in this case takes place off camera, meaning that the videotape does not contradict Cordell's accusations, and, thus, a genuine dispute as to a material fact still exists.

Deputy McKinney's second counterargument fares no better.  He contends that this case is similar to *Iacovone v. Wilkinson*, No. 2:03-cv-652, 2007 WL 490160 (S.D. Ohio 2007), and asks us to dispose of this case similarly.  Appellee Br. at 18.  In *Iacaovone*, prison officials entered a prisoner's cell and ordered him against the wall in preparation for removing him from the cell.  2007 WL 490160, at *8.  The prisoner, who was not in handcuffs, turned toward the prison officials, who responded by pushing his head against the cell wall.  *Id.*  The magistrate judge found that the prison officials acted "in [an] effort[] to preserve internal order and institutional security by forcing plaintiff to obey a direct order."  *Id.*  This case is distinguishable on its facts in three ways:  One, Iacovone was unsecured in his cell, while Cordell was handcuffed and in a submission hold.  Two, Iacovone disobeyed a direct order from the prison

officials, while Cordell claims that Deputy McKinney never warned him to turn around. And three, the magistrate judge found that the prison officials used "*de minimis*" force in *Iacovone*, *id.*, while the force that Cordell claimed that Deputy McKinney used was anything but minimal. As a result, we do not find *Iacovone* persuasive and decline to decide this case similarly.

Deputy McKinney's final counterargument is likewise unconvincing, but it deserves special mention. He directs us to a four-paragraph, unpublished, per curiam decision from the Ninth Circuit—*Alexander v. Perez*, 124 F. App'x 525 (9th Cir. 2005)—in which that court held that there was an Eighth Amendment violation, and he tries to distinguish this case from it. Appellee Br. at 18. This is not argument by analogy, but an appeal to the least common denominator. In *Alexander*, two prison guards "isolated [an inmate] . . . and, while he was handcuffed and not resisting, slammed him against walls twice, punched him, twisted his leg with the intent of breaking it[,] and held his eyelids open while threatening him with pepper spray." 124 F. App'x at 526. The notion that government conduct must rise to this level to be cognizable under § 1983 is contrary to the nature of the Eighth Amendment and our collective sense of decency. Accordingly, we reject it.

In summary, we conclude that a reasonable jury could decide that Deputy McKinney lacked a good-faith basis for using the amount of force that Cordell alleged that he used. The record contains evidence that Cordell's injuries were severe, indicating that a substantial amount of force was used. A reasonable jury could also conclude from the evidence in the record that Cordell did not present a plausible threat to Deputy McKinney or anyone else to justify slamming him headfirst into the wall. And finally, the record contains no evidence that Deputy McKinney made any effort to blunt the impact of Cordell's head against the wall. For these reasons, a reasonable jury could find that Deputy McKinney acted with malicious and sadistic intent to injure Cordell.

## 2. Objective Component

Next, we evaluate the objective component of Cordell's Eighth Amendment claim, asking whether a reasonable jury could conclude that "the pain inflicted" by Deputy McKinney was "sufficiently serious" to offend "contemporary standards of decency." *Williams*, 631 F.3d at 383 (internal quotation marks omitted). Again, in this case, Cordell accuses Deputy McKinney

of slamming him facefirst into a concrete wall while his arms were handcuffed behind his back and the deputy held him in a submission hold. Viewing the record in Cordell's favor, we conclude, for several reasons, that a reasonable jury could decide that Deputy McKinney's use of force was repugnant to "'the evolving standards of decency that mark the progress of a maturing society.'" *Hudson*, 503 U.S. at 10 (quoting *Estelle v. Gamble*, 429 U.S. at 102–03).

First, we reiterate that, if Cordell's allegations are true, a jury would not be unreasonable in concluding that Deputy McKinney's use of force was an entirely unnecessary and disproportionate response to Cordell turning toward the deputy and violated contemporary norms. The record, read in Cordell's favor, shows that Deputy McKinney had Cordell handcuffed, in a submission hold, in a hallway inside the jail, with only correctional officers present. We have held in the past that "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable." *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010); *see also Burgess v. Fischer*, 735 F.3d 462, 474–75 (6th Cir. 2013).[6] While Cordell admitted turning toward Deputy McKinney, presenting a slightly different factual situation, we doubt that slamming a handcuffed and controlled prisoner headfirst into a concrete wall comports with human decency. *See Burgess*, 735 F.2d at 474–75 (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)).

Second, as noted above, Cordell suffered—according to him and his medical expert—rather significant injuries from his contact with the wall. One, he received a laceration on his forehead, a laceration deep and open enough to leave blood on the wall, on the floor, and down Cordell's face. *See* R. 26-1 at 66:20–25 (Cordell Dep.) (Page ID #179); R. 31 at 14:2–5 (Jordan Dep.) (Page ID #383); *id.* at 16:3–11 (Page ID #385); R. 33 at 21:25–22:1 (Coe Dep.) (Page ID #475–76). While Nurse Jordan described the laceration as "so small it was hard to tell if it was a laceration or just an abrasion," R. 29-6 at 1 (Jordan Report) (Page ID #337), and Deputy Coe described it as a "minor cut," R. 33 at 21:14 (Coe Dep.) (Page ID #475), the hospital records indicate that it took five sutures to close the wound, *see* R. 36-1 at 5 (Hospital Records) (Page ID #517). Given its real-world experience, a reasonable jury could conclude that Cordell's injury

---

[6]We note in passing that *Burgess* also involved an excessive-force claim against Deputy McKinney. In that case, the deputy stood accused of executing a takedown of a handcuffed inmate that resulted in multiple facial fractures. *See Burgess*, 735 F.3d at 474.

was more significant than a "minor cut" and that the pain was more severe than that felt from an abrasion.

Two, Deputy McKinney's use of force caused Cordell a neck injury. Immediately after the incident, Cordell complained that he was in "major pain," R. 26-1 at 66:23 (Cordell Dep.) (Page ID #179), and that he was "experiencing pain all over," *id.* at 60:9 (Page ID #173). The hospital's physicians diagnosed him with "whiplash," a "neck strain," and "neck pain following [a] whiplash-type injury." R. 36-1 at 5, 9, 11 (Hospital Records) (Page ID #517, 521, 523). Dr. Bozian read Cordell's x-ray, which was taken the day of the injury, to show "a shift in the axis to the left of the odontoid process." *Id.* at 2 (Dr. Bozian Decl. at ¶ 7) (Page ID #514). He declared, in his professional opinion, that Cordell suffered "inflammation, chronic pain[,] and disability" as a result of Deputy McKinney's use of force. *Id.* at ¶ 8 (Page ID #514).

Three, the impact with the wall left Cordell "very, very groggy," potentially indicating further head trauma. R. 26-1 at 57:22 (Cordell Dep.) (Page ID #170). Together, this information casts serious doubt upon Deputy McKinney's contention that Cordell suffered only de minimis injuries. As a result, a jury would not be unreasonable in finding that these injuries indicate that Cordell suffered serious pain, satisfying the objective component of his Eighth Amendment claim.

The district court rejected both of these contentions, finding that the videotape definitively contradicted Cordell's version of events, that Cordell failed to present evidence beyond his deposition showing that Deputy McKinney used excessive force, and that Cordell "suffered only one minor injury . . . ." R. 42 at 18–19 (D. Ct. Op.) (Page ID #610–11). Each of these conclusions, however, requires a misreading of the record or an improper weighing of the evidence.

As discussed above, the videotape does not conclusively answer any questions. What it does show is Deputy McKinney escorting Cordell briskly, Cordell turning his head toward the deputy as he continues walking forward, Deputy McKinney raising Cordell's handcuffed arms behind his back, and Cordell's torso turning horizontal as Deputy McKinney drives him toward the wall. Security Video, Cordell 2 at 17:12:55.41–17:12:58.34. This sequence of events confirms neither that Deputy McKinney used a reasonable amount of force nor that he brutally

smashed Cordell's head against the wall. Therefore, we must assume, at this stage in the litigation, that Cordell's deposition is accurate, that Deputy McKinney drove Cordell headfirst into a concrete wall. Fed. R. Civ. P. 56(a); *Coble*, 634 F.3d at 870. Doing otherwise was error.

The district court also erred by implicitly requiring Cordell to present evidence in addition to his testimony. The district court stated: "Other than his bare assertion [in his pleadings and deposition], [Cordell] has not provided any evidence [that Deputy McKinney used excessive force]." R. 42 at 18 (D. Ct. Op.) (Page ID #610). With this statement, the district court appears to dismiss the allegations that Cordell made under oath in his deposition. But, as we said recently, "[i]t is not our role at the summary judgment stage to assess whether testimony is believable; such credibility contests are for the trier of fact to resolve." *EEOC v. Ford Motor Co.*, 752 F.3d 634, 642 n.3 (6th Cir. 2014). Therefore, we accept Cordell's statements in his deposition as true and conclude that the district court erred by not doing so.

Finally and similarly, the district court erred in dismissing Cordell's characterization of his injuries. While Cordell's and the prison officials' testimony regarding his injuries differ, we must assume the non-movant's version of events. *Id.* Cordell professes to have debilitating injuries as a result of Deputy McKinney's actions. The hospital records do not contradict his assertions. *See generally* R. 36-1 at 4–14 (Hospital Records) (Page ID #516–26). Therefore, we must credit Cordell's assertions, which entail far more injury and pain than "one minor injury." R. 42 at 19 (D. Ct. Op.) (Page ID #611).

To sum up, at this stage in the litigation, we must accept Cordell's version of events without weighing the evidence or assessing the credibility of prospective witnesses. The district court failed to do so and, thus, committed error. If we do accept Cordell's testimony and allegations as true—that Deputy McKinney rammed Cordell headfirst into the wall while he was handcuffed and controlled—a reasonable jury could conclude that Cordell suffered severe pain that objectively violated our contemporary norms of human dignity. Thus, Cordell has demonstrated that summary judgment on the objective component of his Eighth Amendment claim was inappropriate.

**B. Clearly Established Right**

While we conclude that a reasonable jury could find that Deputy McKinney violated Cordell's Eighth Amendment rights, those Eighth Amendment rights must have been clearly established as of July 20, 2009, or Deputy McKinney is entitled to qualified immunity. *Shreve v. Franklin Cnty.*, 743 F.3d 126, 134 (6th Cir. 2014). For a right to be clearly established, "the right's contours [need to be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023 (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083–84 (2011)). With that said, "[t]he Court [has] noted that '[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (third alteration in original). The Court, however, "'ha[s] [also] repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (quoting *al-Kidd*, 131 S. Ct. at 2074). Despite this high hurdle, we hold that Cordell has carried his burden of showing that his Eighth Amendment rights were clearly established as of the date of his encounter with Deputy McKinney and, thus, that the deputy is not entitled to qualified immunity at this time.

In his briefing, Cordell claims that *Hudson* clearly established that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." 503 U.S. at 9. While there may be much sense in stating that it is inappropriate to grant qualified immunity whenever a jury could find that a jail official acted with malicious and sadistic intent, it seems that *Plumhoff* requires us to frame Cordell's Eighth Amendment right at a lower level of generality. In the past, we have held that "if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable jail official would have known such conduct was wrongful." *Kostrzewa v. City of Troy*, 247 F.3d 633, 642 (6th Cir. 2001). Under this standard, as discussed above, we conclude that any reasonable official would

know that ramming a handcuffed and controlled prisoner headfirst into a concrete wall is an unreasonable method of regaining control of a prisoner in a hallway occupied only by other jail officials. *See Schreiber*, 596 F.3d at 333. Therefore, Cordell's rights were clearly established as of July 20, 2009, and granting qualified immunity at this time is inappropriate.

## IV. CONCLUSION

We recognize that "the limits of [the Eighth Amendment] are not easily or exactly defined," but we believe "broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable." *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968). In this case, if Cordell's contentions are accurate, it would appear that Deputy McKinney behaved brutally, even cruelly, toward Cordell. At this point, however, the facts are not crystallized enough to award judgment as a matter of law to either party. Therefore, we **REVERSE** the district court's grants of summary judgment and qualified immunity and **REMAND** for proceedings consistent with this opinion.