**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted June 26, 2015[*]
Decided July 15, 2015

**Before**

DIANE P. WOOD, *Chief Judge*

JOEL M. FLAUM, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 15-1013

| | |
|---|---|
| DEMETRIUS M. BOYD, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 12-C-0803 |
| WILLIAM POLLARD, et al., *Defendants-Appellees.* | Charles N. Clevert, Jr., *Judge*. |

**O R D E R**

Demetrius Boyd, a Wisconsin inmate, claims that a guard used excessive force in moving him between cells, and that the prison warden and two subordinates were deliberately indifferent to unsanitary conditions in the new cell. *See* 42 U.S.C. § 1983. The

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

district court granted summary judgment for the defendants on both of these Eighth Amendment claims, and we affirm.

Boyd was removed from his cell by five guards, including defendant Joseph Beahm. At summary judgment the district court received evidence of the cell extraction from three sources: Boyd's affidavit, Beahm's affidavit, and a video recorded by an unseen cameraman accompanying the extraction team. According to Boyd, that team—four officers wearing helmets with face shields and a lieutenant armed with an electric stunning device—assembled to move him from his assigned segregation cell to a different wing in the segregation unit. He complied, says Boyd, when told to place his hands though the cell door's trap, and then was restrained and escorted to the other wing. But when they arrived there, Boyd claims, Beahm bodyslammed him onto the concrete floor and placed him in a chokehold. When he was back on his feet, the team walked him into a cell and removed his clothing. After he was in the cell, Boyd continues, he suffered blows to his face and head. He alleged that he briefly lost consciousness and, when he awoke, was lying on the floor with blood dripping down his face. After receiving medical treatment for his injuries, which, Boyd says, included two black eyes, a deep laceration above the right eye, swelling around his temples, and cuts on his wrists, Boyd was placed in a cell, still naked, he said, without clothing, a bed, bedding, towels, or toilet paper.

Beahm, the defendant guard, tells a very different story in his affidavit. At first, Boyd did not comply with the extraction team's directives, Beahm states. When instructed to place his hands through the trap, Boyd instead reached one hand through, grabbed Beahm's arm, and tried pulling his hand into the cell. After the team had cuffed Boyd and entered the cell, he spat on the lieutenant, and so Beahm forced Boyd to the floor. The team then escorted Boyd to the other wing, Beahm continues, while Beahm maintained a compliance hold with his right hand under Boyd's chin and left hand securing the top of Boyd's head to his chest to prevent Boyd from spitting again. When they reached the new wing, Beahm says, Boyd suddenly pushed himself into Beahm's chest, and so he again forced Boyd to the ground. Once in the new cell, the team tried placing a spit mask over Boyd's mouth, but Boyd attempted to bite Beahm's right thumb and struck another guard in the abdomen. Beahm then used a vertical wall stun to control Boyd by forcefully pressing him against the wall. When Boyd stopped resisting, he was taken to a nurse who attended to a wound above his right eye.

The video confirms most of Beahm's account. Boyd's verbal defiance is obvious from the soundtrack, and the video clearly captures him spitting in the lieutenant's face

when his cell door is first opened. The video is inconclusive, though, at points where Boyd's and Beahm's stories differ. Boyd cannot be seen grabbing Beahm's arm or pulling his hand through the trap. And when the team is escorting Boyd to the other wing, he is walking immediately ahead of the team members, who are trailed by—and most often blocking the view of—the cameraman. At one point the video shows Boyd ending up prone on the hallway floor as he and the team near the new wing. Boyd is barely visible while standing, and whether he dropped to the ground or was pushed by Beahm with cause is not evident. At the doorway of his new cell, Boyd's clothes are cut off with shears, and he is brought to his feet and stood against the wall just inside the entrance. He is seen thrashing, though, while the guards affix the spit mask (so that Boyd cannot spit on the nurse called to examine him). From there the team briefly disappears with Boyd inside the cell beyond the cameraman's view, and the sound of a commotion is apparent.

In moving for summary judgment, Beahm argued that the events captured on video eliminate any fact dispute about whether he used excessive force against Boyd. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Beahm asserted that the video does not show him slamming Boyd onto the floor or into a wall but does display Boyd physically resisting the guards. The warden and the two other defendants argued that Boyd had failed to exhaust his conditions-of-confinement claim because, they asserted, Boyd never filed a grievance about the conditions in his new cell.

The district court, in agreeing with Beahm on the excessive-force claim, twice noted that it is unclear what happened from viewing the video and recognized that Boyd and the defendant guard offer different versions of what happened outside the camera's view. But the court reasoned that the video does not substantiate Boyd's assertions about Beahm's behavior and shows only that the guard was trying to control a volatile situation. Concerning the claim of unconstitutional conditions of confinement, the district court concluded that Boyd had failed to exhaust his administrative remedies, *see* 42 U.S.C. § 1997e(a), since he did not dispute that he never filed a grievance.

Boyd contests the district court's ruling on both claims. The claim about the conditions of Boyd's new cell, though, is easily resolved. Boyd insists that the defendants admitted in their responses to his request for admissions, *see* FED. R. CIV. P. 36, that they had received complaints from him about the poor conditions in that cell. Writing

personally to the warden and deputy warden to alert them about his cell conditions, as Boyd says he did, would have had bearing on the merits of his Eighth Amendment claim, but that contention is irrelevant to whether he fulfilled his obligation to exhaust available remedies before filing suit. *See* 42 U.S.C. § 1997e(a); *Thomas v. Reese*, No. 14-3406, 2015 WL 3452916, at *2 (7th Cir. June 1, 2015). Because Boyd did not comply with regulations by filing a grievance, *see* WIS. ADMIN. CODE § DOC 310.07, summary judgment for the defendants on this claim was proper.

Regarding Boyd's excessive-force claim we are in agreement with the district court. Boyd argues that there are disputed facts about what happened when he suddenly dropped to the ground after the group arrived in the new wing of segregation and what occurred inside the new cell, events which were not captured on camera. And if a jury believes his version, Boyd continues, it reasonably could find that Beahm used excessive force.

We disagree. Whether a guard applied force in good faith to resolve a disturbance or, rather, maliciously with intent to cause harm, turns on factors including the threat reasonably perceived by the guard, the need for and amount of force used, efforts made to temper the severity of force used, and the injury suffered by the prisoner. *See Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *Rice ex. rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 668 (7th Cir. 2012); *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). From the video, when Boyd and the guards reach the other wing of the segregation unit, we cannot tell why or how Boyd ended up on the ground and what occurred when Boyd and the guards entered his new cell. Initially it may appear as though this fact dispute would preclude summary judgment. *See, e.g., Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010); *Lewis v. Downey*, 581 F.3d 467, 476–78 (7th Cir. 2009); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014); *Ramirez v. Martinez*, 716 F.3d 369, 374–75 (5th Cir. 2013). However summary judgment would have been improper only if a jury reasonably could find excessive force based on Boyd's assertions. *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 488 (7th Cir. 2014); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014). We conclude that no juror who viewed the video could reasonably conclude—given the professional behavior of the guards and minor injury sustained by Boyd—that the guards, when outside the camera's view, attacked Boyd. For instance, Boyd asserts that he was bodyslammed onto a concrete floor and sustained numerous blows to his head and face so severe as to cause blood to drip down his face. But Boyd's injury—a small laceration above his eye—was minimal and cannot

even be seen bleeding. If Boyd's account was accurate, that minor cut would not have been his sole injury.

AFFIRMED.